UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Calderia, LLC, et al.

      v.

City of Claremont, NH

Civil No. 24-cv-222-LM
Opinion No. 2025 DNH 018 P

**O R D E R**

Plaintiffs Calderia, LLC ("Calderia"), Vanderburgh House, LLC ("Vanderburgh"), and Gregory B. Richards are respectively the owner, the operator, and a former resident, of a sober living home. Plaintiffs bring suit against the City of Claremont, New Hampshire alleging, generally, that the City has subjected them to heightened scrutiny and selective enforcement of its zoning laws due to animus against persons in recovery from substance use disorder. Presently before the court is the City's motion to dismiss for failure to state a claim upon which relief may be granted. Doc. no. 8. The court heard oral argument on the motion on November 4, 2024.[1] For the following reasons, the City's motion is granted in part and denied in part.

---

[1] At the November 4, 2024 hearing, the court also heard oral argument and witness testimony on plaintiffs' motion for a preliminary injunction (doc. no. 16). At the conclusion of the hearing the court denied plaintiffs' motion for a preliminary injunction.

**STANDARD OF REVIEW**

Under Rule 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiffs' favor, and "determine whether the factual allegations in the plaintiff[s'] complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 68, 71 (1st Cir. 2014) (quotation omitted). The court may consider facts alleged in the complaint as well as facts contained in exhibits to the complaint. See Freeman v. Town of Hudson, 714 F.3d 29, 35 (1st Cir. 2013).

A claim is facially plausible "when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Analyzing plausibility is "a context-specific task" in which the court relies on its "judicial experience and common sense." Id. at 679.

Where, as in a discrimination case like this one, "succeeding on a claim involves proving a prima facie case, the elements of the prima facie case inform the court's plausibility assessment." Johnson v. Rapid Sheet Metal, LLC, 560 F. Supp. 3d 623, 627 (D.N.H. 2020) (citing Carrero-Ojeda v. Autoridad de Energia Electrica, 755 F.3d 711, 718 (1st Cir. 2014)). "While the prima facie standard is an evidentiary rather than a pleading standard, and the complaint need not set forth sufficient facts to establish a prima facie case, reference to the prima facie elements can help a court determine whether the cumulative effect of the complaint's factual allegations is a plausible claim for relief." Id. (internal quotation marks omitted).

## BACKGROUND[2]

The sequence of events pertinent to this motion began on April 19, 2024,[3] when the City conducted a site inspection at 189 Broad Street in Claremont, NH (the "Property"), where Vanderburgh was operating a sober living facility.[4] Following that inspection, the City posted a Notice of Violations and Order to Vacate (the "Notice") on May 8, which informed the residents that their occupancy of the Property was unlawful and ordered them to vacate by May 16. The Notice stated that the occupancy was unlawful because the building had undergone a change in use—from a "single-family home" to a "boarding house"—without the issuance of a new certificate of occupancy. Doc. no. 1-1 at 2. The Notice further stated that, in order to obtain a certificate of occupancy for use as a boarding house, plaintiffs would need to obtain "plans" and a "code summary" from a licensed architect. Id. Beyond stating this requirement, the Notice did not offer any further

---

[2] The facts are drawn from the complaint and the exhibits attached thereto.

[3] While the complaint focuses on a sequence of events that took place in 2024, the exhibits to the complaint make it clear that this story goes back further, to at least 2022, when plaintiffs' affiliates purchased the Property and began operating a sober home there. Because the City does not argue that any events prior to the 2024 site inspection are relevant to its motion to dismiss, the court trains its focus on the sequence of events outlined in the complaint.

[4] The court refers to the residential structure located at 189 Broad Street as "the Property". While plaintiffs used (and seek to use) the Property as a "sober home," the court refers to the structure as "the Property" throughout. Notably, there is no dispute that plaintiffs seek to establish a sober living facility, or sober home, as opposed to a rehabilitation or treatment center. Sober homes are not to be confused with residential substance use disorder treatment facilities, otherwise known as rehab centers. Unlike rehab centers, sober homes do not offer medical services or treatment.

explanation as to why "plans" and a "code summary" were necessary, or what they would entail. Despite the fact that the Notice was prepared following a site inspection at the Property, the Notice did not identify any specific conditions that were not in compliance with applicable codes, but did state generally that "[d]ue to a lack of fire protection and life safety features required for the change in use the premises are unfit for human occupancy in their present condition." Id. at 1.

The Notice did not include or cite to the Claremont Code of Ordinances—which contains the relevant definitions for "Family" and "Boarding House." The parties' disagreement as to how those definitions should be applied is central to this dispute. For context, the Code of Ordinances provides the following definitions for those relevant terms:

> *Family* shall mean any number of individuals living together as a single residential housekeeping unit occupying a dwelling unit, provided that a group of not more than five (5) individuals not necessarily related by blood, marriage, or adoption may be considered a family.

> *Boarding House* shall mean a residential building, other than a bed and breakfast, motel, inn or other lodging in which rooms are rented or otherwise made available for compensation to more than two (2) but no more than eight (8) unrelated individuals and where such rooms do not contain separate cooking or bathroom facilities.

Claremont Code of Ordinances § 22-1 (hereinafter "Ordinance").

Plaintiffs responded to the Notice with two letters, the first sent on May 15, and the second on May 21. See doc. nos. 1-2 and 1-3. Both letters bore a Vanderburgh Sober Living letterhead and were signed by Hunter Foote as the Executive Director of that organization. In the May 15 letter, Foote described the

4

operational model of the sober home and explained that its residents lived communally as a "family of choice." Doc. no. 1-2 at 3. Foote also explained that all residents of the Property were individuals in recovery from substance use disorder and asserted that those residents were therefore members of a protected class for purposes of both the Fair Housing Act (as Amended) ("the FHAA") and the Americans with Disabilities Act ("the ADA"). In light of this explanation, Foote requested a "reasonable accommodation under [the FHAA]" for the residents to continue living at the Property under the existing single-family use certificate. Id.

In the May 21 letter, Foote referenced a May 10 conversation with Leigh Hays, Claremont's Chief Building Official and Health Officer, and asserted that, in that conversation, Hays had offered to stay enforcement of the Notice if plaintiffs demonstrated progress toward certification with the New Hampshire Coalition of Recovery Residences ("NHCORR"). According to Foote's letter, however, Hays subsequently revoked that offer. Foote went on to state that, due to Hays' revocation of the offer to stay enforcement, he had reduced the occupancy to five individuals in order to comply with the definition of Family in the Ordinance. Foote then reiterated his request that the residents be allowed to continue living at the Property under the existing single-family certificate as a "reasonable accommodation under Federal Law." Doc. no. 1-3 at 3.

The following week, on May 31, Foote and Hays exchanged emails. Hays first stated the City's position that Vanderburgh's "advertising and organizational structure" demonstrated that plaintiffs' use of the Property qualified as a Boarding

House, because the residents "provide a security deposit and pay weekly rent to reside in a shared bedroom with others they may or may not have known prior to moving in." Doc. no. 1 at ¶ 14. Hays went on to explain that plaintiffs' use of the Property would qualify as "single-family" if Calderia (the owner of the Property) were to enter into a rental agreement with a single resident, and that resident were to have roommates. Hays also wrote that, if Calderia continued to collect separate rent from each resident, plaintiffs' use of the Property could not qualify as single-family. In response, Foote explained that Calderia had reached a rental agreement with a single resident (Richards) and attached a lease between Calderia and Richards. Foote's email went on to state that, because he interpreted the lease agreement as bringing the Property's use into compliance with the ordinance definition of Family, he would inform Richards that he was free to return to the Property and that up to five unrelated roommates could reside there, "provided that they operate as a family." Id.

The City responded on June 11 with a letter signed by Attorney James G. Feleen. In his June 11 letter, Feleen stated that relevant City officials had met to discuss the Property on June 4, and that Foote had been invited to that meeting but failed to attend. He went on to state that the Property could be used as a single-family residence, as long as no more than five unrelated persons lived there. He also stated, however, that if plaintiffs wished to use the Property as a single-family home, they could not provide "sober living programming" without approval from the State Fire Marshal and NHCORR, as well as "a use variance under the Claremont

Zoning Code" because "[n]either medical services nor related service uses are
permitted without a variance in the PR zoning district in which this property is
located." Doc. no. 1-5 at 1. Feleen's letter continued: "We note that your website
advertises weekly rent at this property. We also understand that the bedroom doors
have individual locks. These actions by you may result in the classification of the
actual use as a boarding house regardless of the number of occupants." Id. Feleen's
letter stated a second time that, in order to be used as a boarding house, the
Property would need a new certificate of occupancy, which would require "multiple
permits and building code upgrades." Id. Feleen's letter ended with these
assertions: "Sober living programming as an activity is not a permitted use under
our zoning ordinance in the PR zoning district in which this property is located,"
and that "a use variance is required prior to changing the use." Id. at 1-2. Taken
together with the earlier statement that "[n]either medical services nor related
service uses are permitted" in the relevant zoning district, this constituted a new
position from the City: that a zoning variance would be required to operate a sober
home at the Property, regardless of compliance with the requirements imposed on
either boarding houses or single-family residences.

 Counsel for plaintiffs, Attorney Andrew Tine, responded to the June 11 letter
by email on June 24, 2024. Tine's email refuted Feleen's assertions about the need
for additional approvals. Tine denied that sober living programming involves
medical treatment of any kind or requires prior approval by the State Fire Marshal.
Tine also stated that certification with NHCORR is voluntary, not compulsory. Tine

reiterated plaintiffs' position that the residents of the Property were living as a family, explaining that the residents shared the entire house, including cooking facilities, bathrooms, and common areas, communally shared responsibility for household chores, and actively supported one another in maintaining sobriety. Tine requested that plaintiffs be allowed to continue their use of the Property with five residents under the existing single-family certificate of occupancy. Feleen responded on July 2, informing Tine that the City had reviewed his email and stood by its letter of June 11, 2024.

On July 22, 2024, plaintiffs filed this lawsuit seeking relief on three counts: Count I for discrimination under the FHAA, Count II for discrimination under the ADA, and Count III for intentional infliction of emotional distress under New Hampshire law. The City moves to dismiss all counts pursuant to Rule 12(b)(6).

DISCUSSION

"As a general matter, three theories of liability are cognizable under the FHAA and the ADA: disparate treatment, disparate impact, and failure to make reasonable accommodations." Summers v. City of Fitchburg, 940 F.3d 133, 138-39 (1st Cir. 2019). Here, both Counts I and II claim discrimination under two of these theories: disparate treatment and failure to make reasonable accommodations. See doc. no. 1 at ¶¶ 37, 44. While the complaint contains separate claims for discrimination under the FHAA and the ADA, the theories of liability underlying those claims are assessed under the same legal standards. See Summers, 940 F.3d at 139 (applying same standards to reasonable accommodation claims under both

statutes); Valentin v. Town of Natick, 633 F. Supp. 3d 366, 373 (D. Mass. 2022) (analyzing FHAA disparate treatment claim under the McDonnell Douglas framework); Dichner v. Liberty Travel, 141 F.3d 24, 29 (1st Cir. 1998) (applying McDonnell Douglas framework to ADA disparate treatment claim); see also Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev., 620 F.3d 62, 66 (1st Cir. 2010) ("[A]uthority under the [ADA] is generally persuasive in addressing handicapped discrimination claims under the [FHAA]."). For this reason, the court analyzes plaintiffs' discrimination claims according to the theory of discrimination rather than the framing of the counts in the complaint.

The sufficiency of plaintiffs' pleading regarding Count III for intentional infliction of emotional distress will be addressed separately.

I.    Plaintiffs Have Plausibly Stated a Claim for Relief Under a Reasonable Accommodation Theory of Discrimination

To establish a reasonable accommodation claim under the FHAA or ADA, the plaintiff must show: (1) he is disabled, (2) the defendant knew of the plaintiff's disability, (3) the plaintiff made a particular request for accommodation, (4) the request was "both reasonable and necessary to allow him an equal opportunity to use and enjoy the housing in question[,]" and (5) the request was nevertheless denied. See Astralis, 620 F.3d at 67-68. Here, the City does not contest that plaintiffs can establish the first two elements. See doc. no. 8 at 4. The court's analysis is thus limited to the third, fourth, and fifth elements.

A.    Plaintiffs Have Sufficiently Pled Both That They Made a Proper
Request for Accommodation, and That Their Request was Denied

The court turns first to elements three (whether a request was made) and five (whether the request was denied). Plaintiffs explicitly requested a "reasonable accommodation under federal law" for five individuals to be permitted to live at the Property in their May 21 letter, see doc. no. 1-3, and reiterated that explicit request in their June 24 email to counsel for the City Feleen, see doc. no. 1 at ¶ 20. The City, via Feleen, denied these requests in the June 11 letter, doc. no. 1-5 ("The Order to Vacate remains in effect."), and the July 2 email, doc. no. 1 at ¶ 21 ("the City of Claremont stands by my letter to Mr. Foote of 6/11/2024"). Given the explicit language, these allegations appear to satisfy plaintiffs' pleading burden as to both the third and fifth elements.

The City argues, however, that plaintiffs failed to make a proper request for accommodation because they did not apply for relief from the Zoning Board of Adjustment ("ZBA"), which, the City asserts, is the only entity with the power to grant the relief plaintiffs sought. See Oxford House-C v. City of St. Louis, 77 F.3d 249, 253 (8th Cir. 1996) (holding that a sober home's failure to apply to zoning board for variance was "fatal to their reasonable accommodation claim" because the sober home was required to "give the City a chance to accommodate them through the City's established procedures for adjusting the zoning code"); Smith & Lee Assocs., Inc. v. City of Taylor, 13 F.3d 920, 930 (6th Cir. 1993) (reasonable accommodation claim failed where city council, to whom request for accommodation was made, lacked authority to grant the request under its governing ordinances).

10

According to this argument, plaintiffs' requests for accommodation were not proper requests, because they were made to city officials who were not empowered to grant them.

The City also advances a related argument that, because there was no application to the ZBA, any request for accommodation has not yet been denied. See United States v. Vill. of Palatine, 37 F.3d 1230, 1233 (7th Cir. 1994) ("The zoning process, including the hearings on applications for conditional use permits, serves [the] purpose of enabling a city to make a reasonable accommodation in its rules, policies, and practices. The city must be afforded the opportunity to make such an accommodation.") (internal quotation marks omitted).

Both of the City's arguments rely on the premise that plaintiffs' request for accommodation was made to officials who were not legally empowered to grant it. The City provides two citations to the New Hampshire State Code in support of the premise that the ZBA had the sole authority to grant the requested relief: RSA 674:33 and 676:5. While those provisions do authorize the ZBA to grant variances from the zoning code and hear appeals of zoning determinations made by city officials, nothing in the text of either provision suggests that the ZBA had exclusive authority to grant the relief plaintiffs requested as of May 21.

The City seeks dismissal asserting that the Property is properly characterized as a Boarding House and arguing that a variance would have been required to allow continued occupancy under the existing single-family certificate. Plaintiffs argue that their request (following the reduction in occupancy) was not for

relief from application of the Boarding House definition, which would require a variance—it was instead a request for the City to recognize that their use of the Property (following the reduction) fell within the definition of Family.

At this early stage, the record does not show that a zoning variance would have been required to grant plaintiffs' May 21 request. The court starts with the definition of a variance. The Claremont Code of Ordinances provides:

> *Variance* shall mean relief from the literal meaning and strict application of the zoning ordinance given to the owner of land by the zoning board of adjustment for use of property in a manner that would otherwise violate the zoning ordinance.

Claremont Code of Ordinances § 22-1. See also Husnander v. Town of Barnstead, 139 N.H. 476, 478 (1995) (explaining that a zoning variance is akin to a "safety valve" of zoning administration, operating as a "waiver of the strict letter of the zoning ordinance without sacrifice to its spirit and purpose"). To determine whether a variance would have been required, the court looks to the applicable provisions of the Ordinance to consider whether a "waiver" of their "strict letter" would have been necessary for the City to grant plaintiffs' May 21 request. Here, the question is whether plaintiffs' use of the Property fell under the definition of Family or Boarding House. Again, the code definitions read:

> *Family* shall mean any number of individuals living together as a single residential housekeeping unit occupying a dwelling unit, provided that a group of not more than five (5) individuals not necessarily related by blood, marriage, or adoption may be considered a family.

> *Boarding House* shall mean a residential building, other than a bed and breakfast, motel, inn or other lodging in

12

> which rooms are rented or otherwise made available for compensation to more than two (2) but no more than eight (8) unrelated individuals and where such rooms do not contain separate cooking or bathroom facilities.

Claremont Code of Ordinances § 22-1.

The court finds plaintiffs' characterization of their request plausible because, according to the plain language of the definitions, both could be read to apply to plaintiffs' use of the Property following the reduction in occupancy to five.[5] The code definition of Boarding House can be read to apply to plaintiffs' use of the Property, even after the reduction in occupancy, because there were between two and eight residents, those residents paid rent for rooms, and there were no separate cooking or bathroom facilities. However, after the reduction in occupancy, the Family definition can also be read to apply, because there were not more than five unrelated residents living together, sharing responsibility for household chores, and supporting each other in their recovery. In other words, while application of the Boarding House definition was reasonable, no waiver of the strict letter of the ordinance would have been required for the City to instead classify plaintiffs' use of the Property as single-family use following the reduction in occupancy to five. Thus, a zoning variance would not have been necessary to allow them to continue such use

---

[5] The court does not purport to reach a conclusive determination in this order as to whether either or both of the code definitions applied to plaintiffs' use of the Property as a matter of law. Instead, this order considers only whether, construing the facts in a light favorable to plaintiffs, their request for relief would have necessitated a strict waiver of the letter of the ordinance definitions.

under the existing certificate of occupancy. All that would have been required was a determination that plaintiffs' use fell under the ordinance definition of Family.

While the ZBA is empowered to hear appeals of City officials' determinations related to zoning, the statute granting such authority does not indicate that the ZBA has sole authority to reconsider an official's determination that a particular use of a property falls within one of the ordinance's use definitions and not another. See RSA 674:33(I)(a)(1). Indeed, such a reading of the statute—especially in situations like this one, where relevant circumstances had changed since the initial determination was made—would defy common sense and hamstring City officials in the commission of their duties. Here, following City officials' initial determination that plaintiffs' use of the Property met the definition for Boarding House, plaintiffs changed the nature of their use by reducing occupancy to within the limit contained in the definition of Family. The Court cannot accept a reading of the code that would require intervention by the ZBA in every such situation, and the City offers neither argument nor authority in support of such a reading. While plaintiffs certainly could have made their request for reconsideration of the City's determination to the ZBA, they were not required to do so. The fact that Hays initially offered to stay enforcement of the Notice supports this commonsense understanding—if the ZBA truly had the exclusive authority to allow plaintiffs to maintain their occupancy, Hays would not have been empowered to offer that relief.

For these reasons, construing all facts and granting reasonable inferences in the plaintiffs' favor, the May 21 request did not require action by the ZBA. This

finding short circuits both the City's argument that plaintiffs failed to make a proper request for a reasonable accommodation, and its argument that plaintiffs' request has not yet been denied. Plaintiffs have thus pled facts sufficient to plausibly establish the third and fifth elements of their discrimination claims based on a reasonable accommodation theory.

> B.    <u>Plaintiffs Have Sufficiently Pled That Their Request Was Both Reasonable and Necessary to Allow Them an Equal Opportunity to Use and Enjoy the Housing in Question</u>

The court now turns to the fourth element: whether plaintiffs have plausibly alleged that their request for relief was "both reasonable and necessary to allow [them] an equal opportunity to use and enjoy the housing in question." Astralis, 620 F.3d at 67.

Necessity is not in dispute. Plaintiffs allege that five unrelated individuals living communally, who were not in recovery, would have been permitted to live at the Property under the existing single-family certificate of occupancy. Crediting this allegation, plaintiffs' requested accommodation—permission to occupy the Property under the same conditions—is necessary to allow them "an equal opportunity to use and enjoy the housing in question." Id. The City offers no substantive challenge to the necessity of the request.

The dispute instead centers on whether the request was reasonable. In the context of a request for reasonable accommodation, "[t]he reasonableness requirement calls for a factbound balancing of the benefits that would accrue to the handicapped individual against the burdens that the accommodation would

entail. . . . Typically, an accommodation is reasonable when it imposes no fundamental alteration in the nature of the program or undue financial and administrative burdens on the defendant." Summers, 940 F.3d at 139. Here, plaintiffs allege that they requested an accommodation to use the Property under the existing single-family certificate of occupancy and that their use of the Property comported with all requirements for single-family use. Crediting that allegation, plaintiffs' request would not have imposed a fundamental alteration to the City's zoning program, nor would it have presented any undue financial or administrative burden, because, according to plaintiffs, their use was in fact compliant with the City's zoning scheme.[6] At this stage, plaintiffs' allegations are sufficient to plausibly establish that plaintiffs' request was reasonable.

The City challenges the reasonableness of the request however, citing Summers v. City of Fitchburg, a case in which a Massachusetts sober home operator's request for relief from a Commonwealth sprinkler law was found to be unreasonable. 940 F.3d at 139. There, the First Circuit reasoned that the requested exemption was unreasonable because it "would thwart the very salutary purpose of the Sprinkler Law[,]" and noted that "sprinkler laws play a critical role in fire prevention and, thus, in public safety." Id. at 140.

---

[6] The court's determination that, for purposes of this motion, the City has failed to show that a zoning variance would have been necessary to grant plaintiffs' request further supports the conclusion that the request would not have imposed a fundamental alteration to the City's zoning program.

Summers is distinguishable, however, because plaintiffs here are not seeking relief from a sprinkler law, or any other applicable public safety measure. In Summers, the sober home operator sought relief from a sprinkler law that clearly and unambiguously applied to the homes in question. Indeed, the sprinkler law in that case applied because the homes had six or more residents, and the plaintiffs declined to reduce their occupancy of the homes below that threshold. Id. at 137. Here, as discussed above, plaintiffs are requesting permission to occupy the Property under the existing single-family certificate of occupancy and allege that their use comports with all requirements for single-family occupancy. Unlike in Summers, plaintiffs here are not requesting an exemption from a public safety requirement that clearly applies to them; They are requesting recognition by the City that certain public safety requirements do not apply to them in the first place. Such a determination, that plaintiffs' use of the property falls within the category of uses that does not trigger certain public safety requirements, would not "thwart the very salutary purpose" of those requirements. Id. at 140.[7]

For purposes of the motion to dismiss, plaintiffs have pled sufficient facts to plausibly establish that their request for accommodation was both reasonable and necessary, satisfying the fourth element of the reasonable accommodation theory of discrimination.

---

[7] The court also notes that New Hampshire's sprinkler law differs from the Massachusetts law relevant in Summers in one salient respect—the New Hampshire sprinkler law explicitly exempts "recovery houses" pursuant to certain statutory requirements. See RSA 153:10-d.

17

Because all five elements of the reasonable accommodation theory of discrimination are sufficiently pled, the court finds that plaintiffs have properly stated a claim for discrimination under that theory in both Count I and Count II.

II.    Plaintiffs Have Plausibly Stated a Claim for Relief Under a Disparate Treatment Theory of Discrimination

In addition to the reasonable accommodation theory, plaintiffs also allege discrimination under a disparate treatment theory. Disparate treatment claims brought under the FHAA and the ADA are both analyzed under the McDonnell Douglas framework. See Valentin, 633 F. Supp. at 373, Dichner, 141 F.3d at 29. To establish a prima facie case of disparate treatment under the McDonnell Douglas framework, "[p]laintiffs must . . . present sufficient evidence to permit an inference of discrimination." 2922 Sherman Ave. Tenants' Ass'n v. D.C., 444 F.3d 673, 683 (D.C. Cir. 2006) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973)). This standard is "not onerous" and requires only a "small showing." Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003). While plaintiffs must eventually demonstrate that their disability was at least a partial motivation for defendant's actions toward them, they do not need to show that "it was the sole motivating factor." Casa Marie, Inc. v. Superior Ct. of Puerto Rico for Dist. of Arecibo, 752 F. Supp. 1152 (D.P.R. 1990) (citing Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1037 (2d Cir. 1979)), vacated on other grounds, 988 F.2d 252 (1st Cir. 1993). Multiple categories of circumstantial evidence may be offered to sustain an inference of discriminatory intent. Troupe v. May Dep't Stores Co., 20 F.3d 734,

736 (7th Cir. 1994). Comparative evidence—evidence that the plaintiffs were denied certain favorable treatment while other similarly situated parties received it—is one type of evidence that may be offered, but it is not the only type. Id.

Viewing the facts alleged in the complaint in a light favorable to the plaintiffs and taking reasonable inferences in their favor, plaintiffs have pled sufficient facts to permit a plausible inference of disparate treatment motivated by animus toward persons in recovery. Plaintiffs generally argue that the City has engaged in selective and targeted enforcement, and used the zoning code as a pretext to discriminate by erecting obstacles to their use and enjoyment of the Property that would not have been erected for five or fewer unrelated individuals not in recovery. The City's communications with plaintiffs, viewed together, demonstrate several patterns that support an inference of discriminatory intent.

The clearest example of a communication from which the inference of discriminatory intent can be drawn is the City's June 11 letter. Doc. no. 1-5. Read favorably to plaintiffs, the letter evinces a distinct focus by the City on plaintiffs' intent to use the Property as a sober home rather than their compliance with the Family or Boarding House definitions and requirements. While the City generally frames its engagement with plaintiffs as neutral enforcement of its zoning code (entirely unrelated to plaintiffs' intent to establish a sober home), the June 11 letter undercuts that framing. Instead, it supports the inference that the residents' recovery status was a motivating factor in the City's scrutiny and code enforcement.

19

Further, the letter states that "[s]ober living programming as an activity is not a permitted use under our zoning ordinance in the PR zoning district in which this property is located." Id. This statement suggests that, even if plaintiffs achieved compliance with the code requirements for a Boarding House, they would nevertheless still need to obtain a zoning variance because of their intent to operate a sober home at the Property. The letter offers no explanation of (or support for) this claim, and the City has made no attempt to explain its basis or meaning in any of its filings or argument before the court. While sections 22-386 and 22-387 of the Claremont Code of Ordinances establish a table of permitted uses for each of the City's zoning districts, that table does not include any reference to "sober living programming." To take the fact that the table of uses does not explicitly reference sober living programming to mean that sober housing is not a "permitted use" would also lead to the broader conclusion that sober homes are not permitted in any of the City's zoning districts without a zoning variance. The City has not, thus far, argued that the zoning code establishes such a general prohibition against sober housing, and the court is skeptical of any such interpretation. The letter also contains the statement "[n]either medical services nor related service uses are permitted without a variance in the PR zoning district in which this property is located." Doc. no. 1-5 at 1. However, this claim appears to be incorrect. The table of uses provides that "medical offices" are permitted in the PR zoning district. Setting aside the fact that, on this motion, we accept Plaintiffs' allegation that no medical

services were provided to be true: "medical services and related service uses" <u>are</u> permitted in the PR zoning district without a variance.

The legally dubious claim that sober homes are generally prohibited in the relevant zoning district provides additional support for the inference that the City's scrutiny and enforcement were motivated by an intent to thwart plaintiffs' efforts to establish a sober home at the Property, rather than an intent to neutrally enforce its code. Additionally, the fact that this claim was raised for the first time at this late stage of the parties' back-and-forth independently supports the inference of discriminatory intent. <u>See</u> Appelbaum v. Milwaukee Metro. Sewerage Dist., 340 F.3d 573, 579 (7th Cir. 2003) (reasonable to infer discriminatory intent from shifting or inconsistent explanations of motivation for challenged conduct).

Looking at the City's communications more broadly, and in the light most favorable to plaintiffs, two patterns emerge that both support the inference that the City did not actually intend to help plaintiffs cure their purported violations, but instead intended to prevent plaintiffs' from establishing a sober home at the Property. First, the City's communications were generally unclear as to how plaintiffs could achieve compliance with the relevant code provisions and cure the purported violations. This opacity is evident in the Notice, which, among other issues, fails to cite any specific operative provisions of the New Hampshire Building Code despite purporting to be grounded in that statute, and fails to identify any specific life safety or fire protection issues, despite being issued pursuant to an

inspection of the Property.[8] The lack of clear explanations and instructions permits the inference that the City did not actually intend to help plaintiffs cure their purported violations. Second, the City "moved the goalposts" (Nall v. BNSF Ry. Co., 917 F.3d 335, 347 (5th Cir. 2019)) as to what was required for plaintiffs to cure the purported violations and maintain or resume their occupancy of the Property, for example, when Hays allegedly offered to stay enforcement of the May 8 Notice if plaintiffs demonstrated progress toward NHCORR certification, and then subsequently revoked that offer.[9] Construing these allegations in plaintiffs' favor, it is reasonable to infer that the City's lack of clear instructions to cure, and subsequent goalpost-moving, are both evidence that the City's scrutiny and enforcement were motivated, at least in part, by a discriminatory purpose. See, e.g., Nall, 917 F.3d at 347 ("moving the goalposts" evidence of disparate treatment sufficient to establish prima facie discrimination).

The City argues that plaintiffs nevertheless fail to state a disparate treatment claim because they fail to allege that any non-disabled parties received the treatment to which they claim they are entitled. This argument relies on a misapplication of the case law. Allegations of a comparative nature might indeed be

---

[8] The Notice and Order does cite to RSA chapter 155-A, which is the entirety of the New Hampshire Building Code, but this citation offers little in the way of actual guidance for plaintiffs to understand how to cure their purported violations.

[9] Read favorably to plaintiffs, Hays' failure to offer relief after plaintiffs provided a lease agreement between Calderia and Richards can also be interpreted as "moving the goalposts."

<u>sufficient</u> to state a claim for disparate treatment discrimination, but they are not

<u>required</u>.

While the elements of a prima facie case are relevant to the plausibility

assessment, "the prima facie standard is an evidentiary standard, not a pleading

standard, and there is no need to set forth a detailed evidentiary proffer in a

complaint." <u>Carrero-Ojeda, 755 F.3d at 718</u> <u>quoting</u> <u>Rodriguez-Reyes v. Molina-</u>

<u>Rodriguez, 711 F.3d 49, 54 (1st Cir. 2013)</u>; <u>see also</u> <u>Swierkiewicz v. Sorema N. A.,</u>

<u>534 U.S. 506, 510 (2002)</u>. The fact that other courts have granted summary

judgment based on a lack of comparative <u>evidence</u> following discovery does not

support dismissal here due to a lack of comparative <u>allegations</u>, where plaintiffs

have met their burden to plead facts sufficient to support an inference of

discriminatory intent. <u>Cf.</u> <u>Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George</u>

<u>City, 685 F.3d 917 (10th Cir. 2012)</u> (reviewing grant of summary judgment to

defendant); <u>Gamble v. City of Escondido, 104 F.3d 300 (9th Cir. 1997)</u> (reviewing

grant of summary judgment to the defendant).

As explained by the Supreme Court, "[b]efore discovery has unearthed

relevant facts and evidence, it may be difficult to define the precise formulation of

the required prima facie case in a particular case. Given that the prima facie case

operates as a flexible evidentiary standard, it should not be transposed into a rigid

pleading standard for discrimination cases." <u>Swierkiewicz, 534 U.S. at 512</u>; <u>see also</u>

<u>Ring v. First Interstate Mortg., Inc., 984 F.2d 924, 927 (8th Cir. 1993)</u> ("the prima

facie case that a plaintiff must prove under the [<u>McDonnell Douglas</u>] analysis varies

depending upon the facts of the particular case—thus, there is no 'inflexible formulation' that can be defined at the pleading stage of the lawsuit."); cf. Troupe, 20 F.3d at 736 (comparative evidence is not required, even after discovery, where other types of evidence can support an inference of discriminatory intent).[10]

Here, plaintiffs have pled sufficient facts to permit the inference that the City subjected them to heightened scrutiny and selective enforcement under the zoning code because of their intention to establish a sober home at the Property. Plaintiffs' allegations are therefore sufficient to permit a plausible inference of disparate treatment. Accordingly, the court finds that plaintiffs have properly stated a claim for discrimination under that theory in both Count I and Count II.

III.    Plaintiffs Fail to State a Plausible Claim for Relief for Intentional Infliction of Emotional Distress

Under New Hampshire law, a tort claim for intentional infliction of emotional distress ("IIED") requires allegations of "extreme and outrageous conduct." Morancy v. Morancy, 134 N.H. 493, 496 (1991). The alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

---

[10] The City misreads Valentin v. Town of Natick in suggesting that that case establishes four specific elements for all FHAA disparate treatment claims. See 633 F.Supp.3d at 373. The court in that case articulated elements that were relevant to the specific theory of discrimination advanced therein, but did not purport to articulate a general pleading standard for disparate treatment under the FHAA. Indeed, the articulation of the elements in that case focuses specifically on the denial of permit applications. Id. The FHAA is far broader in scope and encompasses claims beyond the relatively narrow context of permitting disputes.

community." Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723, 728 (2009) (quoting

Mayer v. Town of Hampton, 127 N.H. 81, 87 (1985)).

The allegations in plaintiffs' complaint are insufficient to clear this high bar.

Cases in which IIED claims have gone forward alongside housing discrimination

claims have involved allegations of "open hostility" and "threats of violence." Taylor

v. Sinkevich, No. 3:16-CV-01939-HZ, 2017 WL 3184470 at *3 (D. Or. July 26, 2017).

While plaintiffs have sufficiently alleged facts that could support an inference that

the City engaged in unlawful discrimination, there are no factual allegations that

could support an inference of this kind of "extreme and outrageous conduct."

Morancy, 134 N.H. at 493.

For these reasons, plaintiffs have failed to plead sufficient facts to state a

plausible claim for relief under Count III.

## CONCLUSION

For the reasons explained above, the City's motion to dismiss (doc. no. 8) is

hereby granted in part and denied in part. The motion is granted as to Count III for

IIED, and denied as to Counts I & II for discrimination under the FHAA and the

ADA.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

February 18, 2025
cc:    Counsel of Record